UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. _____

CHELSEY DANIELLE MORGAN, Individually and as Next Friend to G.P. and D.P.,

    Plaintiffs,

  v.

THE MICHAELS ORGANIZATION, LLC,
AMC East Communities, LLC, and MMS Air
Force, LLC,

    Defendants.

_____/

## COMPLAINT

Plaintiffs, Chelsey Morgan, a senior enlisted Air Force servicemember stationed at MacDill Air Force Base in Tampa, Florida ("MacDill"), and her minor children, G.P. and D.P., suffered personal injuries because they lived in unsafe and unhealthy conditions while in privatized on-base military housing provided and managed by Defendants. Defendants' acts and omissions with respect to their operation, management, and maintenance of Plaintiffs' housing, as detailed in this Complaint, led directly to the unsafe and unhealthy conditions of their residence. Moreover, Defendants concealed these conditions from Plaintiffs through false and misleading statements and failure to disclose known hazards. When these conditions were discovered, De-

fendants failed to properly repair and remediate them. Plaintiffs bring this action to hold Defendants accountable for their acts and omissions.

## THE PARTIES

1.    Plaintiff CHELSEY DANIELLE MORGAN resided in Tampa, Florida at all times relevant to this complaint. CHELSEY DANIELLE MORGAN is the parent of Plaintiffs G.P. and D.P., who also resided at 1809 Billy Mitchell Loop, MacDill Air Force Base, Florida at all relevant times.

2.    Defendant THE MICHAELS ORGANIZATION, LLC ("Michaels" or "The Michaels Organization") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. Michaels is registered to do business in Florida.

3.    Defendant AMC EAST COMMUNITIES, LLC ("AMC") is a Delaware limited liability company with its principal place of business at 2 Cooper Street, 14th Floor, Camden, New Jersey 08102. AMC is listed as the "Owner" on the leases signed by the Plaintiffs.

4.    Defendant MMS AIR FORCE, LLC ("MMS") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. MMS is registered to do business in Florida. MMS has acted as property manager with respect to MacDill housing at all times relevant to this complaint.

5.    Non-defendant HARBOR BAY AT MACDILL ("Harbor Bay") is the entity through which Defendants conducted many of the leasing, management, and maintenance activities relating to military housing at MacDill. Upon information and

2

belief, it presents itself as the landlord, appearing as the "Landlord/Lessor" on Mold Addenda, even though Defendant AMC is the lessor on the leases. Upon information and belief, Harbor Bay is also listed as the Community Manager on Plaintiffs' lease and lease addenda. Despite conducting extensive business operations in Florida, Harbor Bay is not a registered entity with the Florida Department of Corporations.

6.      In the related action, *Mullins et al. v. The Michaels Organization, LLC, et al.*, Case No. 8:25-cv-02637-SDM-AAS (M.D. Fla.), Defendant AMC represented to the Court that Harbor Bay is a "common or trade name" of Michaels and not a distinct legal entity. Plaintiffs allege the same upon information and belief. On information and belief, Defendants jointly manage, operate, and maintain MacDill military housing and are jointly responsible for the acts and omissions of Harbor Bay. Allegations concerning Harbor Bay therefore constitute allegations concerning Defendants.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The acts and omissions underlying Plaintiffs' claims occurred on a federal enclave, MacDill Air Force Base, over which the United States was ceded exclusive federal legislative jurisdiction in 1950. Plaintiffs are aware of no developments since 1950 that have had the effect of changing MacDill's status as an exclusive federal enclave.  Because the acts and omissions giving rise to Plaintiffs' claims occurred on an exclusive federal enclave, Plaintiffs' claims are governed by federal law under the Federal Enclave Doctrine for purposes of subject-matter jurisdiction. *See Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952).

3

8.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to Plaintiffs' claims occurred within this District on the federal enclave at MacDill where Plaintiffs were exposed to the conditions at issue.

9.    This Court has personal jurisdiction over Defendants because their acts and omissions—carried out directly and/or through their agents and alter-egos—caused the harms complained of herein which occurred at MacDill. FLA. STAT. § 48.193(1)(a)(2) and § 48.193(1)(a). Defendants also derived substantial revenue, directly or indirectly, from services provided to persons in Florida.

## FACTUAL ALLEGATIONS

### The Military Housing Privatization Initiative

10.    In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI"). 141 Cong. Rec. S18853. The MHPI was intended to improve housing for service members and their families by allowing private housing companies to use their resources and expertise in improving existing military housing and new military housing.

11.    Under the MHPI, a private contractor is granted a long-term lease of military base grounds. The private contractor is responsible for constructing new homes and renovating existing homes and then leasing, operating, managing, and maintaining the housing. The government also typically pays the contractor the full Basic Allowance for Housing ("BAH") to which the service member who rents the home is entitled. In addition, MHPI contractors typically receive performance incentive fees,

payable by the military department based on performance objectives, which include maintenance practices and resident satisfaction.

12.     In response to concerns about dangerous, unsafe, and unhealthy conditions at MHPI housing, the 2020 National Defense Authorization Act created an MHPI Tenant Bill of Rights. The Tenant Bill of Rights specifies that military families have the right to reside in a housing unit that meets applicable health and environmental standards. They have the right to receive property management services that meet or exceed industry standards and that are performed by professional customer service and maintenance staff. 10 U.S.C. §2890. Defendants purport to embrace the Tenant Bill of Rights and to incorporate its protections into their MHPI programs and activities.

13.     Landlords are required to provide a housing unit that meets "minimum health, safety, and welfare standards set forth in Federal, State, and local law" and if a walkthrough prior to move in indicates that those standards are not met, "remediate any issues and make any appropriate repairs[.]" 10 U.S.C. § 2891a(4).

### MHPI Housing at MacDill

14.     In November 2007, AMC East, LLC and the United States Air Force entered into a 50-year lease to privatize military housing at MacDill AFB. In 2021, Michaels acquired the assets of AMC East, LLC and AMC. Michaels either directly or through its subsidiaries or affiliates, assumed all obligations, as the MHPI contractor, including but not limited to obligations under the ground leases, operating agreements, property management agreements, and residential leases.

15.     Plaintiffs paid their BAH to AMC. In addition, the Air Force pays Defendants for management and maintenance of the property. These payments consist of (1) a monthly base fee and (2) an incentive fee payment upon achieving certain performance criteria. To obtain the incentive fee, Defendants submit documentation and a statement that they satisfied performance criteria, including objectives related to maintenance work orders and customer satisfaction.

16.     Language in the Operating Agreement indicated that the Agreement was intended to further the MHPI's goal of benefiting residents of MacDill military housing.

### Defendants' Joint and Integrated Approach to MacDill Housing

17.     Defendants are members of the Michaels conglomerate, at the top of which sits Michaels. Defendants function as an integrated enterprise in their operation of MacDill Housing.

18.     With respect to its activities at MacDill, on information and belief, Michaels operates independently and through entities, including Defendants AMC and MMS and non-defendant Harbor Bay.

19.     The Michaels webpage showcases its involvement in military housing and points to MacDill as one location of its "[q]uality housing from Coast to Coast." Moreover, employees whose e-mail address and signature blocks suggest that they are employed by Michaels regularly work with residents at MacDill, including on leasing and maintenance issues.

20.     Defendants were bound in agency and alter-ego relationships in leasing, operating, managing, maintaining, and repairing the homes at MacDill.

### The Unsafe and Unhealthy Housing Conditions at MacDill

21.     Defendants have long known about mold problems at MacDill. Military families have for years submitted complaints about mold and health issues caused by exposure to mold. The standard lease contains warnings about moisture and mold. The Resident Guidelines and Community Handbook stress the need to immediately report signs of leaks, moisture, or mold.

22.     For example, upon information and belief, Defendants were aware that numerous homes lacked vapor barriers between the first floor and outdoors or contained defective vapor barriers. This allowed unsafe amounts of moisture to enter the homes. Additionally, the air conditioning units in numerous homes lacked secondary drain lines, causing water to leak into homes.

23.     Harbor Bay refused to follow its mold policies, despite knowing that failure to do so would lead to the growth of toxic mold.

### The Morgan Family

24.     Master Sergeant ("MSgt") Chelsey Danielle Morgan, United States Air Force, and her minor children, G.P. and D.P., resided at 1809 Billy Mitchell Loop, MacDill.

25.     Prior to signing the lease for 1809 Billy Mitchell Loop, MSgt Morgan received representations from Defendants' representatives concerning the condition of the home. On information and belief, Defendants provided MSgt Morgan with a

seven-year maintenance history. On information and belief, that history and any accompanying representations did not disclose the mold, moisture intrusion, and structural deficiencies that were known to Defendants or discoverable through reasonable inspection prior to the family's occupancy.

26.    On information and belief, Plaintiffs' lease represented that, prior to moving in, the home was in safe, clean, and habitable condition and free of mold, mildew, and signs of water intrusion. That representation was false. Defendants knew or reasonably should have known that the home contained concealed moisture intrusion and mold conditions that rendered it unfit for habitation. Had Defendants disclosed the true condition of the home, MSgt Morgan would not have signed the lease or agreed to occupy the residence. The specific contents of any pre-lease disclosures, the seven-year maintenance history, and all representations made by Defendants' representatives prior to lease execution are in Defendants' possession and will be obtained through discovery.

27.    Upon information and belief, the lease identified AMC as the Owner and Michaels Management Services, Inc., or its successor, as the Property Manager, and provided that Florida law governed the lease.

28.    During their tenancy, Plaintiffs observed, came into contact with, ingested, and inhaled mold, experienced elevated interior moisture and water intrusion, and suffered personal injuries due to the unsafe and unhealthy conditions described in this Complaint.

29.     Approximately one month after moving into the home, MSgt Morgan discovered what appeared to be visible mold growing from the exhaust fan in the downstairs half bathroom and immediately reported the condition through Harbor Bay's maintenance request system. Around late July 2024, a third-party contractor acting as an agent of Defendants inspected the home and informed MSgt Morgan that the visible growth was "definitely black mold." The contractor cleaned the visible mold and represented to MSgt Morgan, at the residence, that Harbor Bay would return to perform proper remediation of the home. That representation was false.

30.     On information and belief, Defendants knew at the time that the visible cleaning performed on July 20, 2024 was not an adequate remediation, that additional professional remediation was necessary, and that no prompt follow-up remediation had been scheduled or arranged. Defendants made this representation concerning the adequacy of repair and remediation knowing it was false or in reckless disregard of whether it was true, with the intent to induce MSgt Morgan to remain in the home and to believe the hazardous conditions were being addressed.

31.     MSgt Morgan reasonably relied on the representation that proper remediation would follow, trusted the contractor as a trained professional deployed by Defendants to inspect and address the reported mold, and continued to occupy the home with her minor children based on that assurance.

32.     Despite those assurances, no meaningful remediation occurred. From approximately August through October 2024, MSgt Morgan repeatedly contacted Harbor Bay personnel, including Maintenance Supervisor Vincent Williams, Assistant

Community Director Geri Leto, and Operations Coordinator Catherine Alvarez, seeking the promised follow-up remediation. Williams, Leto, and Alvarez, each acting within the scope of their employment with and authority of Defendants, failed to respond to MSgt Morgan's repeated telephone calls and requests and did not disclose to her that the mold conditions in the home remained unaddressed and continued to pose a hazard to her family's health.

33.    By failing to respond and by failing to disclose the continuing danger, Defendants fraudulently concealed the ongoing hazardous conditions from MSgt Morgan and induced her to continue occupying the home without knowledge that the mold conditions remained unremediated and were continuing to harm her family's health.

34.    After repeated telephone calls and requests went unanswered, MSgt Morgan went to Harbor Bay's maintenance office on or about October 20, 2024, in an effort to obtain assistance. Only after that in-person visit did Harbor Bay agree to remediate the home. On or about October 24, 2024, Harbor Bay informed MSgt Morgan that temporary lodging had been secured for her family. The Mogan family was displaced to a Temporary Living Facility beginning on or about October 30, 2024, while Defendants performed remediation activities.

35.    Harbor Bay later represented that the remediation work had been completed and that the home was safe for reoccupancy. That representation was false. On information and belief, the remediation performed during the October–December

2024 period was inadequate and failed to eliminate the mold conditions within the home.

36. Defendants made the representation that the home was safe for reoccupancy knowing it was false or in reckless disregard of whether adequate remediation had occurred, with the intent to induce MSgt Morgan to return her family to the residence and to refrain from seeking alternative housing or pursuing relocation. MSgt Morgan reasonably relied on Defendants' representation that the remediation was complete and the home was safe, and returned with her minor children on or about December 24, 2024. Had Defendants disclosed that the mold conditions had not been adequately remediated, MSgt Morgan would not have returned to the home. The identity of the specific Harbor Bay representative who communicated the clearance for reoccupancy, any written clearance certificate or inspection report generated following the October–December 2024 remediation, and all post-remediation records are in Defendants' possession and will be obtained through discovery.

37. The conditions within the home, however, persisted. During the late summer of 2025, MSgt Morgan observed new mold growth near the thermostat and HVAC system and again notified Harbor Bay. Despite her renewed complaints, Defendants did not promptly investigate the conditions.

38. Approximately six months after MSgt Morgan 's renewed complaints, on January 20, 2026, Defendant finally brought in a contractor, Clearity Environmental, to perform a Moisture and Mold Assessment at 1809 Billy Mitchell Loop. At that point, Defendant represented to MSgt Morgan that she was looking at staining and

11

not mold. On information and belief, the assessment actually documented visible microbial-related staining both inside and outside the HVAC unit and identified conditions raising concern that mold contamination had spread throughout the home's air distribution system. Defendants received those findings, but, on information and belief, produced to MSgt Morgan an incomplete and inaccurate report. On information and belief, despite knowing the true scope of the mold contamination reflected in the Clearity assessment, Defendants scheduled only a duct cleaning as the corrective response, a measure wholly inadequate to remediate the conditions documented in the assessment.

39.    On information and belief, Defendants did not disclose to MSgt Morgan the full findings of the Clearity assessment or the inadequacy of the duct-cleaning response. Defendants, as lessors, landlords, and property managers, had a duty to disclose material information about the condition of the home and the adequacy of proposed remediation. By scheduling a cosmetic corrective measure while concealing the documented extent of the HVAC contamination, Defendants induced MSgt Morgan to remain in the home and to believe that adequate steps were being taken, when they were not. The full Clearity Environmental report, any internal communications regarding its findings, and the scope of the duct cleaning performed are in Defendants' possession and will be obtained through discovery.

40.    While residing in the home, members of the Morgan family experienced health problems consistent with prolonged exposure to moisture and contact with and inhalation and/or ingestion of mold. MSgt Morgan developed persistent sinus prob-

lems. Minor child D.P. experienced breathing difficulties and recurrent sinus symptoms requiring medical evaluation and treatment. Minor child G.P. also experienced breathing difficulties during the period of occupancy. In addition to these physical injuries, MSgt Morgan continues to experience emotional distress and anxiety regarding the potential long-term effects that repeated mold exposure may have on her children's health.

41.    The Morgan family came into contact with and inhaled or ingested mold and other hazardous substances and suffered physical injuries, emotional distress, and other damages as a direct and proximate result of Defendants' acts and omissions. Had MSgt Morgan known the true nature and extent of the hazardous conditions within the residence, she would not have moved into or remained in the home. The family continues to worry about the long-term consequences of their exposure.

42.    Notwithstanding MacDill's status as a federal enclave, those of Plaintiffs' claims that seek recovery for personal injuries (including physical and emotional injuries) are governed, under 28 U.S.C. § 5001(b), by contemporary Florida law. Contemporary Florida law also governs Plaintiffs' claims because all of those claims arise out of Plaintiffs' injuries suffered as a result of Defendants' acts and omissions in leasing, managing, and maintaining the home Plaintiffs leased from Defendants, and Plaintiffs' lease, on information and belief, contains a choice of law provision selecting contemporary Florida law.

## CAUSES OF ACTION

### COUNT I: Breach of Contract
### (against Defendant AMC)

43.    Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

44.    Plaintiffs had a valid lease with AMC. AMC owed contractual obligations to Plaintiffs to provide and maintain habitable housing and remedy leaks, moisture, mold, and other issues. Plaintiffs have complied with all obligations under the lease.

45.    AMC failed to comply with the material terms of the lease by failing to ensure Plaintiffs' home was fit for human habitation and by failing to timely and adequately repair and remedy the conditions of the premises.

46.    As direct and foreseeable results of AMC's breaches, Plaintiffs suffered physical, psychological, emotional, and financial harm. As direct and foreseeable results of AMC's breaches, Plaintiffs suffered substantial actual damages, including personal and property damages, financial damages, damages that require medical monitoring, and attorney's fees and costs.

### COUNT II: Negligence
### (against all Defendants)

47.    Plaintiffs incorporate the allegations set forth in paragraphs 1– [[]].

48.    Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home. Defendants negligently failed to meet the standard of care in performing those duties.

49.    As the property owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain their home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

50.    As property manager for Plaintiffs' MacDill home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

51.    Defendants' acts and omissions in performance of their duties as Plaintiffs' lessors, landlords, and property managers fell far below the standard of care owed to Plaintiffs.

52.    Defendants' acts and omissions breached the duty of reasonable care owed to Plaintiffs by failing to ensure that Plaintiffs' home was safe and fit for habitation.

53.    Defendants breached the duty to exercise ordinary care in multiple respects, including, but not limited to: (a) failure to remediate defects they knew, or reasonably should have known, would cause moisture intrusion, elevated indoor humidity, and microbial growth; (b) failure to reasonably repair and remediate issues related

15

to mold, moisture, and water leaks; (c) failure to adequately respond to Plaintiffs' complaints regarding unsafe conditions in their home; (d) failure to implement appropriate safety protocols to protect residents from toxic mold; (e) failure to properly install, maintain, or replace HVAC systems; (f) failure to take corrective action to address hazardous conditions in Plaintiffs' home of which Defendants had or should have had knowledge; (g) use of untrained and unlicensed workers to repair and remediate Plaintiffs' home; (h) failure to hire and/or train competent employees to properly  repair and remediate Plaintiffs' home; (i) failure to exercise reasonable care to select, employ, instruct, and/or supervise competent and careful contractors to perform work in Plaintiffs' home involving a risk of physical harm unless skillfully and carefully performed and/or to perform any duty which the Defendants owed to third persons; (j) performing only surface-level cleaning of visible mold identified by Defendants' own contractor on July 20, 2024, without undertaking professional remediation, and subsequently representing that the home had been fully remediated and was safe for reoccupancy when Defendants knew or should have known that the underlying mold conditions had not been adequately addressed, thereby inducing Plaintiffs to return to and remain in the home while continuing to be exposed to unremediated mold contamination.

54.    Defendants knew or should have known that maintenance failures had compromised the safety of Plaintiffs' home;

55.    Defendants engaged in additional safety violations and breaches of the duty of care to be determined upon discovery.

56. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

### COUNT III: Gross Negligence
### (against all Defendants)

57. Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

58. Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home at MacDill. Defendants' conduct fell grossly below the applicable standard of care. Moreover, Defendants were recklessly indifferent to the consequences of their acts and omissions and failed to demonstrate even the slight diligence that a reasonable landlord or property manager would have exercised under the same or similar circumstances.

59. As the owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain Plaintiffs' home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

60. As property manager for Plaintiffs' home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plain-

tiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

61.    Defendants were aware that circumstances in Plaintiffs' home constituted an imminent or clear and present danger amounting to more than normal or usual peril with tenants often complaining to Defendants of mold and illnesses.

62.    Defendants' acts and omissions fell grossly below the standard of care owed to Plaintiffs, and exhibited a conscious disregard for the consequences of their behavior, in multiple respects, including: (a) failure to remediate defects that would cause moisture intrusion and microbial growth; (b) failure to reasonably repair and remediate residents' complaints of water leaks and mold;  (c) failure to implement appropriate safety protocols to protect residents from toxic mold; (d) failure to properly install, maintain, or replace HVAC systems;  (e) failure to adequately respond to Plaintiffs' complaints regarding unsafe conditions in their home; (f) failure to warn Plaintiffs that they were being exposed to toxic mold; (g) use of untrained and unlicensed workers to repair and remediate Plaintiffs' home;  (h) failure to exercise reasonable care to select, employ, instruct, and/or supervise competent and careful contractors to perform work in Plaintiffs' home involving a risk of physical harm unless skillfully and carefully performed and/or to perform any duty which the Defendants owed to third persons; (i) performing only surface-level cleaning of visible mold identified by Defendants' own contractor on July 20, 2024, without undertaking professional remediation, and subsequently representing that the home had been fully remediated and was safe for reoccupancy when Defendants knew or should have known that the underly-

ing mold conditions had not been adequately addressed, thereby inducing Plaintiffs to return to and remain in the home while continuing to be exposed to unremediated mold contamination; and (j) engaging in additional safety violations and breaches of the duty of care to be determined upon discovery.

63.     Each of the Defendants' reckless indifference to the rights of Plaintiffs is the equivalent to an intentional violation of them.

64.     As a direct and proximate result of Defendants' gross negligence, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

## COUNT IV: Omitted

## COUNT V: Negligent Infliction of Emotional Distress
### (against all Defendants)

65.     Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

66.     By their acts and omissions, Defendants caused Plaintiffs to be exposed to, come into direct physical contact with, and ingest and/or inhale mold within their home.

67.     As a result of that physical contact and exposure, Plaintiffs suffered physical injury, including, but not limited to, respiratory illness, and other bodily harm.

68.     As a direct consequence of these physical injuries, Defendants caused the Plaintiffs to suffer severe emotional distress, including worry, anxiety, anguish, suffering, and grief.

69.     Plaintiffs' claims for emotional distress arise directly from physical impacts and resulting physical injuries caused by Defendants' conduct. Each Plaintiff sustained direct physical contact with toxic mold within the home and suffered resulting physical injuries, including respiratory illness, allergic reactions, skin conditions, and other bodily harm documented in this Complaint. Each Plaintiff's emotional distress arises from and is accompanied by these physical injuries.

70.     Defendants knew or should have known that Plaintiffs' home was unsafe to reside in, and that exposure to and contact with mold would inevitably occur and would result in physical harm to Plaintiffs. Defendants also knew or should have known that their assurances that Plaintiffs' homes were safe and not infested with mold, and their assurances that they would repair Plaintiffs' home, would cause Plaintiffs to remain in their home and suffer ongoing harm.

71.     Defendants knew or should have known that their statements that remediation was complete were, in fact, assurances that Plaintiffs' home was safe and not infested with mold, and that Plaintiffs would rely on those assurances and continue to occupy the home and suffer physical injury.

72.     As a direct result of Defendants' negligence and gross negligence, Plaintiffs came into physical contact with and ingested and/or inhaled mold.

73.     Plaintiffs suffered severe emotional distress as a result of that unhealthy and dangerous contact. Plaintiffs suffered physical injury as a result of the emotional distress.

74.     Plaintiffs have suffered, are suffering, and will continue to suffer severe emotional distress and associated harms because of Defendants' acts and omissions.

### COUNT VI: Intentional Infliction of Emotional Distress
### (against all Defendants)

75.     Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

76.     Defendants intentionally and knowingly subjected Plaintiffs to housing conditions that were unsafe and unhealthy.

77.     Defendants also recklessly misled Plaintiffs into moving into a home that they knew was dangerous and unfit for human habitation. Defendants then deceived the Plaintiffs into remaining in their home by falsely claiming that they would eliminate those dangers.

78.     This intentional conduct, which subjected Plaintiffs to risk of serious injury or injury over a prolonged period, was extreme and outrageous.

79.     Intentionally subjecting the Plaintiffs to such dangerous conditions and taking actions to ensure their continued exposure, is beyond all possible bounds of decency and intolerable in a civilized community.

80.     This conduct caused severe emotional distress, as Plaintiffs suffered serious injuries and watched their loved ones get sick, and eventually understood that they were constantly in grave danger in their own home.

81.     Plaintiffs suffered emotional and physical injury due to their severe emotional distress.

## COUNT VII: Breach of the Warranty of Habitability
### (against Defendant AMC)

82. Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

83. AMC breached express and implied warranties of habitability.

84. AMC owed Plaintiffs a duty to provide them with habitable living conditions, under Fla. Stat. § 83.51, including but not limited to a duty to exercise reasonable care in the operation, inspection, management, and maintenance of Plaintiffs' home. AMC failed to meet the standard of care in performing those duties. On information and belief, in their lease, AMC warranted that the housing it provided was safe, habitable, and free from defects.

85. AMC failed to live up to its duty to inspect the Plaintiffs' home prior to their moving in, in order to make necessary repairs, and transfer them to a reasonably safe home.

86. After Plaintiffs moved in, AMC did not reasonably maintain the home to meet the ordinary and normal standards of fitness. The presence of moisture and mold in Plaintiffs' home was a dangerous condition that AMC should have remediated.

87. As a result of AMC's breach of the express and implied warranties of habitability, Plaintiffs suffered substantial physical injuries and damage as well as harm to their personal property and other financial harm. Plaintiffs also suffered severe mental and emotional distress related to contact with and ingestion and/or inhalation

of toxic mold. Plaintiffs suffered special damages and will require ongoing testing/medical monitoring.

### COUNT VIII: Third-Party Beneficiary Contract
### (against all Defendants)

88.     Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

89.     Defendants are bound by their contracts with the Air Force respecting MHPI housing at MacDill. Each of those contracts was entered into to further the goal of the MHPI to improve housing for service members.

90.     The Operating Agreement entered originally into by AMC East, LLC and the Air Force creating AMC contains language establishing that Plaintiffs were intended beneficiaries of Defendants' contractual obligations with respect to the provision of housing at MacDill. On information and belief, the current version of any Operating Agreement under which AMC presently operates continues to contain such or similar language.

91.     On information and belief, the Ground Lease entered into by the Air Force and AMC, also contains language indicating that Plaintiffs were intended beneficiaries.

92.     On information and belief, property management agreements governing Defendants' property management practices at MacDill also contain provisions indicating that Plaintiffs were intended beneficiaries of those agreements.

93.     Defendants and the Air Force intended to benefit the service members living at MacDill. MSgt Morgan is a servicewoman living at MacDill with her family.

The obligations to provide these intended benefits were included in the underlying contracts to ensure military service members, including Plaintiffs, would be provided with safe and habitable housing.

94.   Defendants breached the requirements of the underlying contracts by failing to provide suitable management, maintenance, operations, and renovations of Plaintiffs' home.

95.   Defendants also breached the duty of good faith and fair dealing implied in the contracts.

96.   As a foreseeable result of the Defendants' breaches of the contracts, Plaintiffs, who are intended, direct, third-party beneficiaries of such contracts, sustained damages.

## COUNT IX: Negligence Per Se
### (against all Defendants)

97.   Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

98.   Defendants owed Plaintiffs a duty to take steps to protect them from the specific injuries outlined in this Complaint.

99.   This duty was created by statutes specifically intended to protect Plaintiffs from those harms.

100.   For example, section 19-231 of Tampa's Code of Ordinances states that, "No person shall occupy or let to another for occupancy or offer to let to another for occupancy any dwelling or dwelling unit which does not comply with the following

24

standard." It then outlines a list of specific requirements intended to protect residents' health and safety. Defendants failed to comply with these requirements, including:

a) *"General condition of rental unit.* Each dwelling unit let or offered to let shall be clean, sanitary, fit for human habitation and in a good state of repair." §19-231(17);

b) "Every floor, wall and ceiling shall be capable of affording privacy and shall be maintained in a good state of repair." §19-231(10);

c) "*Plumbing fixtures and pipes.* Every plumbing fixture and water and waste pipe shall be maintained in good working condition, free from defects, leaks and obstructions." §19-231(13);

d) "*Kitchen and bathroom floors.* Floors in kitchens and bathrooms, except where constructed of materials impervious to moisture, shall be covered with asphalt, vinyl-plastic, rubber tile, ceramic tile, terrazzo or linoleum or other durable, waterproof, nonabsorptive material." §19-231(14)(a);

e) "*Flooring generally.* All other flooring throughout the dwelling shall be of approved grade and type of material properly installed." §19-231(14)(b);

101.    Defendants also failed to comply with § 19-232, which provides that, "The owner shall be responsible for the repair and replacement of all plumbing facilities and equipment." § 19-232(7).

102.    Defendants also failed to comply with § 19-47, which provides that, "Nothing shall be allowable on the premises within the corporate limits of the city provided for in this chapter that shall in any way be offensive or noxious by reason of

the emission of odors, gases, dust, smoke, light, vibration or noise … nor shall anything be constructed or maintained that would in any way constitute an eyesore or nuisance to adjacent property owners or residents or to the community."

103.    Additionally, Florida has a statutory framework regulating mold-related services in order to protect Plaintiffs from the injuries described above. FLA. STAT. § 468.84 *et seq.*

104.    The Florida legislature determined that this statutory framework is "necessary in the interest of the public safety and welfare, to prevent damage to real and personal property, to avert economic injury to the residents of this state, and to regulate persons and companies that hold themselves out to the public as qualified to perform mold-related services." *Id.* § 468.84.

105.    Defendants failed to comply with the following statutory requirements:

a)  "A person may not … perform or offer to perform any mold assessment unless the mold assessor has documented training in water, mold, and respiratory protection under § 468.8414(2)." *Id.* § 468.8419(1)(a);

b)  "A person may not … perform or offer to perform any mold remediation to a structure on which the mold assessor or the mold assessor's company provided a mold assessment within the last 12 months." *Id.* § 468.8419(1)(d);

c)  "A person may not … accept an engagement to make an omission of the assessment or conduct an assessment in which the assessment itself, or

26

the fee payable for the assessment, is contingent upon the conclusions of the assessment." *Id.* § 468.8419(1)(h);

d) "A mold remediator, a company that employs a mold remediator, or a company that is controlled by a company that also has a financial interest in a company employing a mold remediator may not …perform or offer to perform any mold remediation unless the remediator has documented training in water, mold, and respiratory protection under § 468.8414(2)." *Id.* § 468.8419(2)(a);

e) "A mold remediator, a company that employs a mold remediator, or a company that is controlled by a company that also has a financial interest in a company employing a mold remediator may not …perform or offer to perform any mold assessment to a structure on which the mold remediator or the mold remediator's company provided a mold remediation within the last 12 months." *Id.* § 468.8419(2)(d).

106.  Plaintiffs are members of the class that each of the above statutes were designed to protect.

107.  The statutes were intended to protect residents from the sorts of exposure-based injuries suffered by Plaintiffs and described in this Complaint.

108.  Additionally, Florida Statutes § 386.03, § 386.051, and § 386.041 make it unlawful to maintain a sanitary nuisance as defined in Florida Statute § 386.01, and any other applicable statutes, codes, and regulations governing the habitability of residential housing and the health and safety of occupants.

27

109. The violations of these statutes constitute negligence per se and were the proximate cause of Plaintiffs' injuries.

## COUNT X: Medical Monitoring
### (against all Defendants)

110. Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

111. Plaintiffs suffered physical injuries when they were exposed to hazardous mold, as described in this Complaint.

112. As a result of their prolonged exposure to moisture-damaged indoor environments and associated microbial contamination at 1809 Billy Mitchell Loop, the Morgan family faces an increased and individualized risk of developing chronic and latent health conditions.

113. MSgt Morgan developed persistent sinus problems during the period of exposure, consistent with chronic upper respiratory inflammation caused by mold; she requires ongoing ENT evaluation and monitoring for the development of chronic sinusitis, nasal polyposis, and related airway disease.

114. Minor child D.P. experienced breathing difficulties and recurrent sinus symptoms requiring medical evaluation and treatment during the exposure period, presentations consistent with mold-induced respiratory sensitization; D.P. requires pulmonary function testing, allergy and immunologic evaluation, and continued monitoring for the development of asthma, reactive airway disease, and chronic sinusitis.

115.    Minor child G.P. also experienced breathing difficulties during the period of occupancy and requires pulmonary function testing and allergy evaluation to assess for reactive airway disease and mold-related respiratory sensitization.

116.    All minor Plaintiffs, whose immune and respiratory systems are still developing, face heightened long-term vulnerability from prolonged mold exposure, making early and ongoing monitoring particularly critical.

117.    Although specific mold species testing was not performed for the Morgan family during their tenancy, the January 20, 2026 Clearity Environmental Moisture and Mold Assessment documented visible microbial-related staining both inside and outside the HVAC unit and identified conditions indicating that mold contamination had spread throughout the home's air distribution system, providing objective evidence of significant and sustained microbial exposure. These findings corroborate the Morgan family's exposures and inform the specific monitoring protocols that are reasonably necessary for each Plaintiff according to contemporary scientific principles.

118.    Early detection through monitoring is material because the chronic and latent conditions associated with sustained mold exposure, including reactive airway disease, asthma, chronic sinusitis, and hypersensitivity pneumonitis, may not manifest clinically for months or years after the exposure ends. The monitoring protocols required will differ for each Plaintiff based on their individual presentations, but each member of the Morgan family would benefit from regular evaluation.

119.    The monitoring procedure would be unnecessary in the absence of Plaintiffs' exposure.

120. Given the exposure, monitoring regimes are reasonably necessary according to contemporary scientific principles.

121. Plaintiffs are entitled to the cost of medical monitoring necessary to detect the onset or worsening of physical harm and/or, in the alternative, that the court use its equitable powers to create and supervise a medical monitoring fund.

## COUNT XI: Unjust Enrichment
### (against Defendant AMC)

122. Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

123. Plaintiffs conferred a benefit on AMC in the form of the BAH rent that the military transferred on their behalf. These funds belonged to Plaintiffs and were paid to AMC in return for safe and habitable housing at MacDill.

124. AMC failed to provide Plaintiffs with a safe and habitable home, and failed to fully compensate Plaintiffs for the costs and inconvenience of their displacement to a Temporary Living Facility from approximately October 30 through December 24, 2024, during Defendants' remediation activities. It would be inequitable and unjust for AMC to retain the BAH funds provided by Plaintiffs.

125. Plaintiffs are entitled to restitution of some or all of the BAH funds paid to AMC.

## COUNT XII: Violation of Florida Deceptive and
### Unfair Trade Practices Act (FDUTPA) (Unfair Conduct)
### (against all Defendants)

126. Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

127. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204.

128. At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA. FLA. STAT. § 501.203.

129. At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA. *Id.*

130. Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted unfair and/or unconscionable acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

131. On information and belief, Defendants failed to follow their own policies and procedures relating to the treatment of harmful conditions, including policies and procedures for the treatment and remediation of mold.

132. Defendants' acts and practices exposed Plaintiffs to unsafe and unhealthy conditions, including toxic mold, structural defects, water leaks, and HVAC issues. These abhorrent conditions were known to Defendants.

133. Given those unconscionable conditions, Plaintiffs' interests in their Mac-Dill home were only worth a small fraction of the rental payments for that home.

134.   Defendants' acts and practices offended established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. As such, those acts and practices were unfair and unconscionable within the meaning of the FDUTPA and thus violated the FDUTPA.

135.   As a result of Defendants' unfair and unconscionable acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. FLA. STAT. § 501.211.

## COUNT XIII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Deceptive Conduct) (against all Defendants)

136.   Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

137.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful deceptive acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

138.   At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA, *see id.*, *e.g.*, § 501.203.

139.   At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA, *see id.*

140. Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted false, misleading, and/or deceptive acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

141. On information and belief, AMC, as signatory to the lease, and all Defendants, through Harbor Bay's direct and ongoing communication with Plaintiffs, engaged in deceptive acts and practices, including the following:

a) Defendants concealed facts and made deceptive assurances that caused Plaintiffs to sign lease that they never would have signed had they known the truth;

b) Defendants made false, misleading, and/or deceptive representations that Plaintiffs' MacDill home was in habitable condition and thus far more valuable than it was in reality;

c) On information and belief, in the lease between Defendants and Plaintiffs, Defendants falsely warranted that Plaintiffs' housing was safe, habitable, and free from defects;

d) Defendants failed to disclose information that they knew about the condition of Plaintiffs' housing with the intention of inducing Plaintiffs into leasing the home at a cost beyond what it was actually worth;

e) Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants falsely claimed that they would mitigate or fix those problems;

f) Defendants made false, misleading, and/or deceptive representations that repairs and remediation efforts were performed completely and to the standard of care required of professional landlords;

g) Defendants failed to disclose the grossly inadequate nature of their repair and remediation efforts.

142. As a result of Defendants' deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. FLA. STAT. § 501.211.

143. Plaintiffs paid far more in rent than their home was actually worth.

144. Due to their role in the leasing and/or management and maintenance of the Plaintiffs' home at MacDill, Defendants were uniquely aware of the condition of Plaintiffs' home, maintenance history, defects in design, the need for repairs, remodeling, and remediation, and the existence of mold and other hazardous conditions.

145. As a result of Defendants' false, misleading, and deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. *Id.* § 501.211.

### COUNT XIV: Negligent Misrepresentation Concerning Condition of the Home
### (against all Defendants)

146. Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

147. On information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition and free of mold, mildew, and signs of water intrusion.

148.    Defendants either knew that Plaintiffs' home was unsafe and unfit for human habitation, made representations concerning the safety and habitability of the home without knowledge of their truth or falsity, or should have known that such representations were false.

149.    Defendants intended to convince Plaintiffs to sign a lease and move into their home based on these representations.

150.    Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions to move into their home.

151.    Plaintiffs justifiably relied on Defendants' assurances that their home was safe, mold free, and fit for human habitation at the time that they moved in.

152.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT XV: Negligent Misrepresentation Concerning Repair
and/or Remediation of Unsafe Conditions
(against all Defendants)**

153.    Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

154.    Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants, including via Harbor Bay, downplayed the severity of those problems in order to convince Plaintiffs to remain in their home.

155.   Defendants falsely represented that hazardous and unsafe conditions, including mold, elevated indoor moisture would be fixed. Defendants knew or should have known that this was untrue.

156.   Defendants falsely told Plaintiffs that there was no moisture in their home, when they knew or should have known that there was moisture.

157.   When Plaintiffs persisted in demanding that Defendants repair unsafe and hazardous conditions in their home, Defendants falsely claimed that they would take appropriate steps to mitigate or fix those problems. Defendants either knew that they would never take those steps, made the representations without knowledge of their truth or falsity, or should have known the representations were false.

158.   On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when they knew or should have known that they had not adequately done so.

159.   Defendants intended to convince Plaintiffs to remain in their home or agree to continue their occupancy based on these false representations.

160.   Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions whether to remain in their home.

161.   Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

162.   As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial dam-

ages, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

### COUNT XVI: Fraudulent Inducement
### (against all Defendants)

163. Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

164. Defendants deliberately, willfully, and knowingly made false and material statements regarding the habitability and safety of Plaintiffs' housing as described in detail in this Complaint in order to induce Plaintiffs to sign a lease.

165. On information and belief, Defendants' false and misleading representations included a seven-year maintenance history that failed to disclose the conditions within the home.

166. On information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of water intrusion. Defendants either knew or should have known that this was false at the time.

167. These representations were material to Plaintiffs' decisions to enter into their lease causing Plaintiffs' BAH to be paid to Defendants.

168. Plaintiffs relied on Defendants' assurances that their home was safe and fit for human habitation at the time that they moved in.

169. Defendants knew or reasonably should have known that these statements, including the representations in the lease and the seven-year maintenance his-

tory report, were false. But for the Defendants' false statements, Plaintiffs would not have signed the lease for their MacDill home.

170.   As a direct and proximate result of Defendants' fraudulent inducement, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require ongoing medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVII: Fraudulent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

171.   Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

172.   Defendants, including via Harbor Bay, deliberately and willfully made false and material statements regarding the habitability and safety of the Plaintiffs' housing, in order to cause Plaintiffs to remain in their home notwithstanding the unsanitary and dangerous conditions in the home.

173.   Defendants made false statements to Plaintiffs that their home was suitable for habitation throughout the course of Plaintiffs' residence in the home.

174.   Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants consistently deliberately and falsely downplayed the severity of those problems. Defendants knew or should have known the true severity of those conditions.

175.   When Plaintiffs persisted in demanding that Defendants repair unsafe and hazardous conditions in their home. Defendants falsely claimed that they would

take steps to mitigate or fix those problems. Defendants knew or should have known that they would never do so.

176. On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when they knew or should have known that they had not adequately done so.

177. Defendants knew that the statements concerning the condition and maintenance of the home and the promised remediation were false.

178. Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

179. These representations were material to Plaintiffs' decisions to remain in their home.

180. But for Defendants' false statements, Plaintiffs would not have remained in their MacDill home.

181. As a direct and proximate result of Defendants' fraudulent misrepresentation, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

### COUNT XVIII: Fraudulent Concealment of Condition of Housing
### (against all Defendants)

182. Plaintiffs incorporate the allegations set forth in paragraphs 1– 42.

183. Defendants deliberately, willfully, and actively concealed material facts regarding the habitability and safety of the Plaintiffs' housing, including on infor-

mation and belief by falsifying or withholding the seven-year maintenance history report, in violation of 10 U.S.C. § 2892a, in order to cause Plaintiffs to sign a lease for their MacDill home.

184. On information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of any water intrusion. Defendants either knew or should have known that this would conceal the true conditions at their home.

185. Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of hazardous and unsafe conditions in their home.

186. Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

187. Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to sign a lease and move into their home and should have been disclosed.

188. Defendants knew that their concealments would induce Plaintiffs to act.

189. Plaintiffs relied on Defendants' concealments and omissions.

190. But for the Defendants' fraudulent concealments and material omissions, Plaintiffs would not have signed the lease for their MacDill home.

191. As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs suffered substantial damage to their personal property, physical injuries, fi-

nancial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

### COUNT XIX: Fraudulent Concealment Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)

192. Plaintiffs incorporate the allegations set forth in paragraphs 1–42.

193. Defendants, including through Harbor Bay, deliberately and willfully actively concealed material facts regarding the habitability and safety of Plaintiffs' housing in order to cause Plaintiffs to remain in their MacDill home.

194. Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of continuing hazardous and unsafe conditions in their home.

195. Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

196. Defendants fraudulently concealed ongoing dangers in the home by representing to MSgt Morgan that the October–December 2024 remediation had been successfully completed and that the home was safe for reoccupancy when the underlying mold conditions had not been adequately addressed, and by scheduling only a cosmetic duct cleaning in response to the January 2026 Clearity Environmental Moisture and Mold Assessment, which documented visible microbial-related staining inside and outside the HVAC unit, while failing to disclose to MSgt Morgan the full extent of the contamination that assessment documented.

197. Defendants fraudulently concealed ongoing dangers in the home by engaging in cosmetic repairs that disguised the continuing hazardous and unsafe conditions while telling Plaintiffs that repairs had been successfully completed.

198. Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to remain in their home and should have been disclosed.

199. Defendants knew that their concealment or omission would induce the Plaintiffs to act or refrain from acting.

200. Plaintiffs relied on Defendants' concealments and omissions.

201. But for the Defendants' fraudulent concealments and material omissions, Plaintiffs would not have remained in their MacDill home.

202. As a direct and proximate result of Defendants' fraudulent concealment, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

## DAMAGES

As a result of the Defendants' breaches, negligence, gross negligence, fraud, and other acts and omissions described in this Complaint, Plaintiffs have sustained damages and injuries and are entitled to recover damages related to the following, including but not limited to:

    a. Past and future physical pain and suffering;

b. Past and future mental anguish and emotional distress;

c. Past and future medical, healthcare, and attendant care expenses;

d. Past and future lost income and earning capacity;

e. Past and future physical impairment;

f. Past and future loss of enjoyment and quality of life;

g. Past and future loss of enjoyment of property;

h. Increased risk of future harm and medical monitoring for life;

i. Loss of life expectancy;

j. Out of pocket expenses;

k. Loss of and/or damage to personal property;

l. Costs, expenses, and fees, including attorneys' fees; and

m. Punitive damages.

**PRAYER FOR RELIEF**

Plaintiffs pray that this Court:

A. Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

B. Award punitive damages as appropriate, including for counts III, V, VI, VII, IX, XIV, XV, XVI, XVII, XVIII, and XIX in an amount to be determined at trial;

C.  Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses, or fees, including attorneys' fees, to which they may be entitled by law, and;

D.  Grant the Plaintiffs such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.


DATED: July 16, 2026.                    Respectfully submitted,

                                         */s/ Robert J. McKee*
                                         Robert J. McKee
                                         Florida Bar No.: 972614
                                         THE MCKEE LAW GROUP, LLC
                                         2800 South Flamingo Road
                                         Davie, Florida 33330
                                         Tel: (954) 888-9877
                                         Fax: (954) 217-0150
                                         Email: rmckee@themckeelawgroup.com

                                         Kristina Baehr*
                                         Christopher LaCour*
                                         **JUST WELL LAW, PLLC**
                                         1809 Pearl Street
                                         Austin, Texas 78701
                                         Tel: (512) 693-8029
                                         Email: Kristina@well.law
                                         Email: Chris@well.law
                                         Email: Militaryhousing-lit_PLslistserv@well.law

                                         Vincent J. Colatriano*
                                         Michael Weitzner*
                                         COOPER & KIRK, PLLC
                                         1523 New Hampshire Ave. NW
                                         Washington, D.C. 20036
                                         Tel: 202-220-9600

44

Fax: 202-220-9601
Email: vcolatriano@cooperkirk.com
Email: mweitzner@cooperkirk.com

*Pro Hac Vice forthcoming*

*Attorneys for Plaintiffs*